IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANGEL BORG,                                    No. CIV S-06-0987-DFL-CMK-P

        Petitioner,

  vs.                                                 FINDINGS AND RECOMMENDATIONS

ROSANNE CAMPBELL, et al.,

        Respondents.

                           /

        Petitioner, a state prisoner proceeding with appointed counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the denial of parole in 2004. Pending before the court is petitioner's pro se petition for a writ of habeas corpus (Doc. 1), filed on May 5, 2006. Respondents filed an answer (Docs. 9 & 10) on June 21, 2006, and petitioner filed a pro se traverse (Doc. 12) on July 31, 2006. Following appointment of counsel on August 28, 2006, the court allowed the parties to file supplemental briefing. Petitioner, through counsel, filed a supplemental brief in support of his petition (Doc. 19) on October 10, 2006, and respondents filed a supplemental response brief (Doc. 21) on November 9, 2006. Petitioner, again through counsel, filed a supplemental traverse (Doc. 22) on November 28, 2006.

## I.  BACKGROUND

The following description of petitioner's commitment offense is taken from petitioner's supplemental brief:

> On June 28, 1992, . . . petitioner drove his red Chevy Impala along side of the victim's car.  Victor Castelan and two others accompanied petitioner.  The victim reached down. . . .  Shots were then fired from the Impala, killing the victim.

Petitioner admitted the killing was gang-related.  Petitioner and Castelan were charged with murder.  Castelan entered a plea agreement under which he pleaded no contest and received a sentence of 15 years to life, plus five years for an enhancement.  Petitioner also agreed to a no contest plea in exchange for dismissal of all enhancements alleged against him and a 15 year to life sentence.

On March 26, 2002, petitioner appeared before the Board of Prison Terms for his first parole hearing.  The Board denied parole, finding that petitioner would pose an unreasonable risk of danger to society of released from prison.  In making this decision, the Board considered:  (1) petitioner's commitment offense, noting that it was carried out in a cruel manner, involved two potential victims, and that the motive was trivial in relation to the offense; (2) petitioner's record of violence and failed juvenile probation; and (3) petitioner's participation in beneficial self-help and therapy programming.  As to the last item, the Board concluded that petitioner had not sufficiently participated in such programs and that he would need to continue self-help and therapy in order to face, understand, and cope with stress in a non-destructive manner.

On June 30, 2004, petitioner again appeared before the Board for parole consideration.  Again, the Board denied parole.  The Board announced the following decision at the conclusion of petitioner's hearing:

> . . . Okay, Mr. Borg, we have a decision.  The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that the Prisoner is not suitable for parole and

would pose an unreasonable risk or danger to society and a threat to public safety if released from prison. We do feel that this offense was carried out in an especially cruel and callous manner. Basically, it was a drive-by shooting. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for another human being, for the suffering of a human being and for the good of the public, firing a weapon in an urban area. The motive for the crime was inexplicable. These conclusions were drawn from the Statement of Facts wherein on 6/28/92, the victim sustained multiple gunshot wounds to the head and face. He was pronounced dead at San Joaquin Hospital. Circumstances surrounding the offense is that the Prisoner was involved in a situation where he pulled alongside of the victim and fired his weapon, and as a result, the victim dies. The Prisoner did have an escalating pattern of criminal conduct, a history of unstable relationships. We're talking about his choice of people that he associated with as a youth. He failed previous grants of probation or I should say wardship of juvenile court. He failed to profit from society's previous attempts to correct his criminality and that was wardship of the court and juvenile hall. An unstable social history. Certainly, his association with different undesirable elements, his involvement in the use of alcohol and marijuana at a very early age was not a socially desirable situation.

The Board then discussed petitioner's conduct over the preceding year:

> . . . The Prisoner has shown a propensity, potential to improve his behavior in the prison since this last year. He has improved somewhat. Recent psychological report by Dr. Frederickson shows that, and that is dated 10/12/01. We will request a new psychological evaluation. Shows that the Prisoner is making progress, shows that his level of dangerousness is improved in terms of being in a structured environment, as well as an unstructured environment. So, certainly, he's making progress in that area. The Prisoner did put some effort in his parole plans. It appears that his parole plans will be acceptable, both employment and a place to live and the Prisoner has developed marketable skills that can be put to use upon his release. . . . We find that the Prisoner is making progress. We encourage him to continue making that progress, continue to participate in positive kinds of self-help programs. The kinds that will enable him to be able to face, discuss, and understand and cope with stress in a non-destructive manner, especially the kinds of friends that he associates with, gangs, et cetera. Until enough progress is made, the Prisoner continues to be unpredictable and a threat to others. . . . [T]hose positive aspects of his behavior do not outweigh the factors of his unsuitability.

As to Dr. Frederickson's report, the Board stated:

> . . . Recent psychological report shows that the Prisoner is making progress. . . . However, it shows that the Prisoner is beginning to turn the corner. And that's another reason for the . . . denial. It shows that he's at

> the point where he is, in incarceration, where he's beginning to make that transition to the possibility of becoming a productive and a positive citizen in the community. And it shows that he's on the right track. However, it indicates the need for a longer period of observation and evaluation. [The] Prisoner has not completed the necessary programming which is essential to his adjustment and needs additional time to gain programming. Therefore, a longer period of observation and evaluation of the Prisoner is required before the Board shall find that he's suitable for parole.

The Board's decision also reflects that it considered a letter from the San Joaquin County District Attorney's office in opposition to parole – the same letter considered at the 2002 parole hearing.[1] Finally, the Board considered a Life Prisoner Evaluation prepared by prison correctional counselors for the 2004 parole hearing.[2] In this evaluation, the correctional counselors concluded that petitioner "would probably possess a moderate degree of threat to the public at this time if released from prison." The counselors suggested that petitioner could benefit from: (1) maintaining a record free from disciplinary actions; (2) maintaining a positive work record; and (3) continuing to participate in any available self-help groups. As to this evaluation, the Board stated:

> . . . Now, regarding the correctional counselor's report, although the correctional counselor seemed to have put a lot of thought in the Board report it may be prudent that his next Board report be completed by a different correctional counselor. The Board does feel that the Prisoner's participation in self-help program[s] is a positive and not a negative thing and we want him to be encouraged to continue participating in those kinds of things. So we are requesting that, if it's possible, that a new correctional counselor prepare the next report since there was such a discrepancy in terms of how the Prisoner is being reported for and how the correctional counselor views his participation in activities.

/ / /

---

[1] The Board states in its 2004 decision that a more recent letter was not considered because it was not timely received.

[2] While this document, which is attached to the pro se petition as Exhibit K, is not signed or otherwise dated, it is clear that it was prepared after the 2002 parole hearing because it references dates subsequent to that hearing. Therefore, this document is something new considered at the 2004 hearing which was not available at the time of the 2002 hearing.

On November 19, 2004, petitioner filed a habeas corpus petition in the California Superior Court, challenging the June 30, 2004, parole denial. That petition was denied on December 15, 2004. The state court gave the following reasons for denying petitioner's habeas petition:

> **REASONS:** In March 1993, petitioner was convicted of second degree murder in conjunction with a plea agreement. He was sentenced to 15 years to life.
> Petitioner received parole hearings on March 26, 2002, and June 30, 2004. It is this most recent hearing which is the subject of this petition.
> Petitioner contends that the Board of Prison Terms ("BPT") has violated his rights in finding him unsuitable for parole.
> The Board's decision regarding suitability for parole should be affirmed if it is supported by "some evidence." (citations to state court decisions omitted). In this case, the Board's conclusion is supported [by] some evidence.

In a footnote, the state court added:

> Petitioner is correct in his complaint that the Board's decision indicates that he was the shooter despite evidence to the contrary. However, the "contrary" evidence indicates that petitioner was the driver of a vehicle, who pulled up alongside another vehicle driven by the victim, so that his *passenger* could shoot the victim with a gun owned by petitioner. This is a distinction with little difference in weighing the factors of the underlying offense.

On March 11, 2005, petitioner filed a second habeas petition, this time in the California Court of Appeal. That petition was denied without comment or citation on March 17, 2005. Finally, petitioner filed a habeas petition in the California Supreme Court on June 7, 2005. That petition was denied with citations to People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Rosenkrantz, 29 Cal.4th 616 (2002).

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

(Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards.  A state court

decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refused to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear

error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

Petitioner challenges the 2004 denial of parole, primarily arguing that the Board's continued reliance on immutable factors violated his due process rights because such factors cannot constitute "some evidence" required to support the decision. In their answer, respondents argue that this court lacks subject matter jurisdiction because petitioner does not have a liberty interest in parole and that petitioner's claims are not exhausted. On the merits, respondents also argue that petitioner received all the process he was due because he was given an opportunity to be heard and was advised on the reasons he was found unsuitable for parole. Finally, respondents argue that, if this court applies the "some evidence" standard to analyze the merits, the Board's decision nonetheless satisfies due process.

/ / /

/ / /

Many of the legal questions presented by this case have recently been addressed by the Ninth Circuit in Sass v. Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006). In particular, the Ninth Circuit held that California's parole statute does, in fact, create a federally cognizable liberty interest. See id. at 1127-28. On the merits, the court also rejected the argument that the "some evidence" standard does not apply. See id. at 1128-29. Under Superintendent v. Hill, 472 U.S. 445, 455 (1985), dues process requires a prison hearing decision, like parole, be based on "some evidence" in the record as a whole which supports the decision. This standard is not particularly stringent and is satisfied where "there is any evidence in the record that could support the conclusion reached." Id. at 455-56. In Sass, the Ninth Circuit held:

> Hill's some evidence standard is minimal, and assures that "the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary." (citation omitted). Hill held that although this standard might be insufficient in other circumstances, "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." (citation omitted). To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest – that in parole – without support or in an otherwise arbitrary manner. We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context.

Sass, 461 F.3d at 1129.

Therefore, this court must reject respondents' arguments that this court lacks subject matter jurisdiction and that the "some evidence" standard does not apply on the merits.

In reaching its decision in 2004 to deny parole, the Board considered the following: (1) the facts of petitioner's commitment offense; (2) petitioner's pre-conviction criminal and social history; (3) petitioner's conduct in prison; (4) Dr. Frederickson's 2001 psychological evaluation; and (5) a letter from the District Attorney's Office opposing parole, originally submitted at the 2002 hearing. There can be no dispute but that facts related to petitioner's commitment offense and history are immutable – they will always be the same. The court, therefore, will focus on the Board's consideration of the remaining factors.

1         First, as to petitioner's psychological condition, the record reflects that, in 2002,
2 the Board considered Dr. Frederickson's October 2001 psychological evaluation.  In the 2002
3 parole decision, the Board characterized this evaluation as demonstrating that petitioner was
4 "turning the corner" and making progress, but that petitioner had not sufficiently participated in
5 relevant programming and that he would need to continue self-help and therapy in order to ". . .
6 face, understand, and cope with stress in a non-destructive manner."  In 2004, the Board again
7 relied on the same 2001 evaluation, and characterized it much the same way.  Specifically, the
8 Board again concluded that, based on the 2001 evaluation, petitioner was turning the corner but
9 that further therapy, programming, and observation were required.  While the Board noted in
10 2004 that it was relying on a stale evaluation, and stated that a new evaluation would be
11 obtained, the record does not reflect that this ever happened or, if it did, that the Board issued
12 any kind of amended decision reflecting consideration of an updated evaluation.

13         In this factual context, the court finds that the 2001 psychological evaluation is
14 also an immutable factor in that, unless the Board considers a current evaluation, there is no
15 possibility for a different outcome.  In other words, the Board's continued reliance on Dr.
16 Frederickson's assessment that, in 2001, petitioner was turning the corner forecloses any
17 possibility that petitioner has actually turned the corner and been rehabilitated.  The court is left
18 to wonder why, if the Board said in 2002 that petitioner was turning the corner and making
19 progress toward rehabilitation, the Board's 2004 decision does not reflect consideration of a
20 current psychological evaluation.

21         Next, as to the letter from the District Attorney's Office, the 2004 hearing
22 decision relied on the same letter introduced at the 2002 hearing.  Therefore, under the same
23 logic discussed above with respect to petitioner's psychological evaluation, the letter is also an
24 immutable factor in that it will always be the same.
25 / / /
26 / / /

        Finally, as to petitioner's conduct in prison, the record reflects that the Board considered in 2004 a Life Prisoner Evaluation prepared by correctional counselors. This evaluation was prepared <u>after</u> the 2002 parole hearing. In the evaluation, the correctional counselors opined that petitioner "would probably possess a moderate degree of threat to the public at this time if released from prison." The evaluation was based, in part, on interviews with petitioner as well as his prison record of disciplinary action and constructive programming. Clearly, the Life Prisoner Evaluation considered by the Board in 2004 is not an immutable factor given that it reflects changes in petitioner's status. Specifically, it is different than the Life Prisoner Evaluation considered by the Board in 2002 and reflects petitioner's conduct since that time.

        While the court finds that the Board relied on several immutable factors, the court also finds that, in relying on the post-2002 Life Prisoner Evaluation, the Board necessarily relied on something new. Therefore, any claim that the 2004 denial of parole was based solely on immutable factors lacks merit. The question becomes whether the Life Prisoner Evaluation constitutes "some evidence." Because this standard is met by evidence which could support the decision to deny parole, <u>see</u> <u>Hill</u>, 472 U.S. at 455-56, and because the post-2002 Life Prisoner Evaluation could support the 2004 parole denial, the court concludes that the "some evidence" standard was met in this case. Specifically, the Life Prisoner Evaluation considered in 2004 reflects petitioner's adverse disciplinary history since the 2002 parole hearing and concludes that petitioner would still pose a threat to society. Clearly, this constitutes "some evidence" to support the decision in 2004 to deny parole. The state court's decision, therefore, is neither contrary to nor an unreasonable application of clearly established federal law.

        Because the court concludes that petitioner is not entitled to relief on the merits, it is unnecessary to address respondents' exhaustion argument. In addition, because the court concludes that the 2004 parole decision at issue in this case was not based solely on immutable factors, the court does not address when the continued reliance on such factors constitutes a due

process violation.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied and that the Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  December 22, 2006.

                                  /s/ Craig M. Kellison  
                                  **CRAIG M. KELLISON**  
                                  UNITED STATES MAGISTRATE JUDGE