1
2
3
4
5
6
7

8                     **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ANGEL BORG,                              No. CIV S-06-0987-DFL-CMK-P

12              Petitioner,

13         vs.                                 <u>AMENDED FINDINGS AND</u>
                                               <u>RECOMMENDATIONS</u>
14    ROSANNE CAMPBELL, et al.,

15              Respondents.

16    _____/

17              Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18    for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the denial of parole in

19    2004.  Pending before the court is petitioner's pro se petition for a writ of habeas corpus (Doc.

20    1), filed on May 5, 2006.  Respondents filed an  answer (Docs. 9 & 10) on June 21, 2006, and

21    petitioner filed a pro se traverse (Doc. 12) on July 31, 2006.  Following appointment of counsel

22    on August 28, 2006, the court allowed the parties to file supplemental briefing.  Petitioner,

23    through counsel, filed a supplemental brief (Doc. 19) on October 10, 2006, and respondents filed

24    a supplemental response brief (Doc. 21) on November 9, 2006.  Petitioner, again through

25    counsel, filed a supplemental traverse (Doc. 22) on November 28, 2006.  The court has also

26    considered the parties' objections filed on January 12, 2007, and January 16, 2007.

# I. BACKGROUND

The following description of petitioner's commitment offense is taken from petitioner's supplemental brief:

> On June 28, 1992, . . . petitioner drove his red Chevy Impala along side of the victim's car. Victor Castelan and two others accompanied petitioner. The victim reached down. . . . Shots were then fired from the Impala, killing the victim.

Petitioner admitted the killing was gang-related. Petitioner and Castelan were charged with murder. Castelan entered a plea agreement under which he pleaded no contest and received a sentence of 15 years to life, plus five years for an enhancement. Petitioner also agreed to a no contest plea in exchange for dismissal of all enhancements alleged against him and a 15 year to life sentence.

On March 26, 2002, petitioner appeared before the Board of Prison Terms for his first parole hearing. The Board denied parole, finding that petitioner would pose an unreasonable risk of danger to society if released from prison. In making this decision, the Board considered: (1) petitioner's commitment offense, noting that it was carried out in a cruel manner, involved two potential victims, and that the motive was trivial in relation to the offense; (2) petitioner's record of violence and failed juvenile probation; and (3) petitioner's participation in beneficial self-help and therapy programming. As to the last item, the Board concluded that petitioner had not sufficiently participated in such programs and that he would need to continue self-help and therapy in order to face, understand, and cope with stress in a non-destructive manner.

On June 30, 2004, petitioner again appeared before the Board for parole consideration. Again, the Board denied parole. The Board announced the following decision at the conclusion of petitioner's hearing:

> . . . Okay, Mr. Borg, we have a decision. The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that the Prisoner is not suitable for parole and

would pose an unreasonable risk or danger to society and a threat to public safety if released from prison. We do feel that this offense was carried out in an especially cruel and callous manner. Basically, it was a drive-by shooting. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for another human being, for the suffering of a human being and for the good of the public, firing a weapon in an urban area. The motive for the crime was inexplicable. These conclusions were drawn from the Statement of Facts wherein on 6/28/92, the victim sustained multiple gunshot wounds to the head and face. He was pronounced dead at San Joaquin Hospital. Circumstances surrounding the offense is that the Prisoner was involved in a situation where he pulled alongside of the victim and fired his weapon, and as a result, the victim dies. The Prisoner did have an escalating pattern of criminal conduct, a history of unstable relationships. We're talking about his choice of people that he associated with as a youth. He failed previous grants of probation or I should say wardship of juvenile court. He failed to profit from society's previous attempts to correct his criminality and that was wardship of the court and juvenile hall. An unstable social history. Certainly, his association with different undesirable elements, his involvement in the use of alcohol and marijuana at a very early age was not a socially desirable situation.

The Board then discussed petitioner's conduct over the preceding year:

. . . The Prisoner has shown a propensity, potential to improve his behavior in the prison since this last year. He has improved somewhat. A recent psychological report by Dr. Frederickson shows that, and that is dated 10/12/01. We will request a new psychological evaluation. Shows that the Prisoner is making progress, shows that his level of dangerousness is improved in terms of being in a structured environment, as well as an unstructured environment. So, certainly, he's making progress in that area. The Prisoner did put some effort in his parole plans. It appears that his parole plans will be acceptable, both employment and a place to live and the Prisoner has developed marketable skills that can be put to use upon his release. . . . We find that the Prisoner is making progress. We encourage him to continue making that progress, continue to participate in positive kinds of self-help programs. The kinds that will enable him to be able to face, discuss, and understand and cope with stress in a non-destructive manner, especially the kinds of friends that he associates with, gangs, et cetera. Until enough progress is made, the Prisoner continues to be unpredictable and a threat to others. . . . [T]hose positive aspects of his behavior do[] not outweigh the factors of his unsuitability.

As to Dr. Frederickson's report, the Board stated:

. . . Recent psychological report shows that the Prisoner is making progress. . . . However, it shows that the Prisoner is beginning to turn the corner. And that's another reason for the . . . denial. It shows that he's at

3

1     the point where he is, in incarceration, where he's beginning to make that
      transition to the possibility of becoming a productive and a positive citizen
2     in the community.  And it shows that he's on the right track.  However, it
      indicates the need for a longer period of observation and evaluation. [The]
3     Prisoner has not completed the necessary programming which is essential
      to his adjustment and needs additional time to gain programming.
4     Therefore, a longer period of observation and evaluation of the Prisoner is
      required before the Board shall find that he's suitable for parole.

5

6     The Board's decision also reflects that it considered a letter from the San Joaquin County

7     District Attorney's office in opposition to parole – the same letter considered at the 2002 parole

8     hearing.[1]

9          Finally, the Board considered a Life Prisoner Evaluation prepared by a prison

10    correctional counselor for the 2004 parole hearing.[2]  In this evaluation, the counselor noted:

11    "From the time of his incarceration in the California Dept. of Corrections . . . in 1993 <u>through the</u>

12    <u>present time</u>, inmate Borg's behavior can be described as poor."  (emphasis added).  The

13    counselor also noted that "Borg's last disciplinary report was 10/25/00."[3]  As to petitioner's

14    participation in self-help programming, the counselor stated  that petitioner only wanted to spend

15    less time in his cell and talk about himself.   The correctional counselor concluded that petitioner

16    "would probably possess a moderate degree of threat to the public at this time if released from

17    prison."  The counselors suggested that petitioner could benefit from: (1) maintaining a record

18    free from disciplinary actions; (2) maintaining a positive work record; and (3) continuing to

19    _____

20        [1]    The Board states in its 2004 decision that a more recent letter was not considered
      because it was not timely received.

21
          [2]    While this document, which is attached to the pro se petition as Exhibit K, is not
22    dated, it is clear that it was prepared after the 2002 parole hearing because it references dates
      subsequent to that hearing.  Therefore, this document is something new considered at the 2004
23    hearing which was not available at the time of the 2002 hearing.

24        [3]    In this regard, the evaluation is somewhat inconsistent.  On the one hand, the
      evaluation references petitioner's "poor behavior" through the present time, that time being after
25    the 2002 parole hearing (January 26, 2004, is the latest date referenced in the evaluation).  On
      the other hand, the evaluation states that petitioner's last "disciplinary report" was issued in
26    October 2000.

4

participate in any available self-help groups.  As to this evaluation, the Board stated:

> . . . Now, regarding the correctional counselor's report, although the correctional counselor seemed to have put a lot of thought in the Board report it may be prudent that his next Board report be completed by a different correctional counselor.  The Board does feel that the Prisoner's participation in self-help program[s] is a positive and not a negative thing and we want him to be encouraged to continue participating in those kinds of things.  So we are requesting that, if it's possible, that a new correctional counselor prepare the next report since there was such a discrepancy in terms of how the Prisoner is being reported for and how the correctional counselor views his participation in activities.

On November 19, 2004, petitioner filed a habeas corpus petition in the California Superior Court, challenging the June 30, 2004, parole denial.  That petition was denied on December 15, 2004.  The state court gave the following reasons for denying petitioner's habeas petition:

> **REASONS:**  In March 1993, petitioner was convicted of second degree murder in conjunction with a plea agreement.  He was sentenced to 15 years to life.
> Petitioner received parole hearings on March 26, 2002, and June 30, 2004.  It is this most recent hearing which is the subject of this petition.
> Petitioner contends that the Board of Prison Terms ("BPT") has violated his rights in finding him unsuitable for parole.
> The Board's decision regarding suitability for parole should be affirmed if it is supported by "some evidence." (citations to state court decisions omitted).  In this case, the Board's conclusion is supported [by] some evidence.

In a footnote, the state court added:

> Petitioner is correct in his complaint that the Board's decision indicates that he was the shooter despite evidence to the contrary.  However, the "contrary" evidence indicates that petitioner was the driver of a vehicle, who pulled up alongside another vehicle driven by the victim, so that his *passenger* could shoot the victim with a gun owned by petitioner.  This is a distinction with little difference in weighing the factors of the underlying offense.

On March 11, 2005, petitioner filed a second habeas petition, this time in the California Court of Appeal.  That petition was denied without comment or citation on March 17, 2005.  Finally, petitioner filed a habeas petition in the California Supreme Court on June 7, 2005.  That petition

1  was denied with citations to People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Rosenkrantz,

2  29 Cal.4th 616 (2002).

3

4                          **II.  STANDARDS OF REVIEW**

5          Because this action was filed after April 26, 1996, the provisions of the

6  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

7  applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

8  (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

9  does not, however, apply in all circumstances.  When it is clear that a state court has not reached

10 the merits of a petitioner's claim, because it was not raised in state court or because the court

11 denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

12 habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

13 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to

14 reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204,

15 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

16 perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

17 evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

18 petition de novo where state court had issued a ruling on the merits of a related claim, but not the

19 claim alleged by petitioner).  When the state court does not reach the merits of a claim,

20 "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

21         Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d)

22 is not available for any claim decided on the merits in state court proceedings unless the state

23 court's adjudication of the claim:

24                          (1) resulted in a decision that was contrary to, or involved an
                            unreasonable application of, clearly established Federal law, as
25                          determined by the Supreme Court of the United States; or

26  / / /

1      (2) resulted in a decision that was based on an unreasonable
2      determination of the facts in light of the evidence presented in the State
       court proceeding.

3   28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

4   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

5          Under § 2254(d), federal habeas relief is available where the state court's decision

6   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

7   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

8   Court), the United States Supreme Court explained these different standards.  A state court

9   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the

10  Supreme Court on the same question of law, or if the state court decides the case differently than

11  the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

12  court decision is also "contrary to" established law if it applies a rule which contradicts the

13  governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

14  that Supreme Court precedent requires a contrary outcome because the state court applied the

15  wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

16  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

17  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

18  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

19  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

20  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

21  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

22         State court decisions are reviewed under the far more deferential "unreasonable

23  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

24  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

25  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

26  suggested that federal habeas relief may be available under this standard where the state court

7

1    either unreasonably extends a legal principle to a new context where it should not apply, or

2    unreasonably refused to extend that principle to a new context where it should apply.  See

3    Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

4    decision is not an "unreasonable application of" controlling law simply because it is an

5    erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,

6    123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot

7    necessarily be found even where the federal habeas court concludes that the state court decision

8    is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear

9    error fails to give proper deference to state courts by conflating error (even clear error) with

10   unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

11   law, where a state court decision is an "unreasonable application of" controlling law, federal

12   habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

13   283 F.3d at 1052 n.6.

14            The "unreasonable application of" standard also applies where the state court

15   denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

16   848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions

17   are considered adjudications on the merits and are, therefore, entitled to deference under the

18   AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

19   The federal habeas court assumes that state court applied the correct law and analyzes whether

20   the state court's summary denial was based on an objectively unreasonable application of that

21   law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# III. DISCUSSION

Petitioner challenges the 2004 denial of parole, primarily arguing that the Board's continued reliance on immutable factors violated his due process rights because such factors cannot constitute "some evidence" required to support the decision.  In their answer, respondents argue that this court lacks subject matter jurisdiction because petitioner does not have a liberty interest in parole.  Respondents also argue that petitioner's claims are not exhausted.  On the merits, respondents argue that petitioner received all the process he was due because he was given an opportunity to be heard and was advised on the reasons he was found unsuitable for parole.  Finally, respondents argue that, if this court applies the "some evidence" standard to analyze the merits, the Board's decision nonetheless satisfies due process.

Many of the legal questions presented by this case have recently been addressed by the Ninth Circuit in <u>Sass v. Bd. of Prison Terms</u>, 461 F.3d 1123 (9th Cir. 2006).  In particular, the Ninth Circuit held that California's parole statute does, in fact, create a federally cognizable liberty interest.  <u>See id.</u> at 1127-28.  On the merits, the court also rejected the argument that the "some evidence" standard does not apply.  <u>See id.</u> at 1128-29.  Under <u>Superintendent v. Hill</u>, 472 U.S. 445, 455 (1985), due process requires a prison disciplinary hearing decision be based on "some evidence" in the record as a whole which supports the decision.  This standard is not particularly stringent and is satisfied where "there is any evidence in the record that could support the conclusion reached."  <u>Id.</u> at 455-56.  In <u>Sass</u>, the Ninth Circuit also addressed the argument that the requirement of "some evidence" in the parole context has not been clearly established by the Supreme Court.  The Ninth Circuit held:

> <u>Hill</u>'s some evidence standard is minimal, and assures that "the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary."  (citation omitted).  <u>Hill</u> held that although this standard might be insufficient in other circumstances, "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact."  (citation omitted).  To hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest –

1    that in parole – without support or in an otherwise arbitrary manner.  We
2    therefore reject the state's contention that the some evidence standard is
     not clearly established [by the Supreme Court] in the parole context.

3    <u>Sass</u>, 461 F.3d at 1129.

4    Therefore, this court must reject respondents' arguments that this court lacks subject matter

5    jurisdiction and that the "some evidence" standard does not apply on the merits.

6           In reaching its decision in 2004 to deny parole, the Board considered the

7    following: (1) the facts of petitioner's commitment offense; (2) petitioner's pre-conviction

8    criminal and social history; (3) petitioner's conduct in prison; (4) Dr. Frederickson's 2001

9    psychological evaluation; and (5) a letter from the District Attorney's Office opposing parole,

10   originally submitted at the 2002 hearing.  There can be no dispute but that facts related to

11   petitioner's commitment offense and history are immutable – they will always be the same.

12          As to petitioner's psychological condition, the record reflects that, in 2002, the

13   Board considered Dr. Frederickson's October 2001 psychological evaluation.  In the 2002 parole

14   decision, the Board characterized this evaluation as demonstrating that petitioner was "turning

15   the corner" and making progress, but that petitioner had not sufficiently participated in relevant

16   programming and that he would need to continue self-help and therapy in order to ". . . face,

17   understand, and cope with stress in a non-destructive manner."  In 2004, the Board again relied

18   on the same 2001 evaluation, and characterized it much the same way.  Specifically, the Board

19   again concluded that, based on the 2001 evaluation, petitioner was turning the corner but that

20   further therapy, programming, and observation were required.  While the Board noted in 2004

21   that it was relying on a stale evaluation, and stated that a new evaluation would be obtained, the

22   record does not reflect that this ever happened or, if it did, that the Board issued any kind of

23   amended decision reflecting consideration of an updated evaluation.

24          In this factual context, the court observes that the 2001 psychological evaluation

25   is also an immutable factor in that, unless the Board considers a current evaluation, there is no

26   possibility for a different outcome.  In other words, the Board's continued reliance on Dr.

10

1 Frederickson's assessment that, in 2001, petitioner was turning the corner forecloses any
2 possibility that petitioner has actually turned the corner and been rehabilitated.  The court is left
3 to wonder why, if the Board said in 2002 that petitioner was turning the corner and making
4 progress toward rehabilitation, the Board's 2004 decision does not reflect consideration of a
5 current psychological evaluation.

6 Next, as to the letter from the District Attorney's Office, the 2004 hearing
7 decision relied on the same letter introduced at the 2002 hearing.  Therefore, under the same
8 logic discussed above with respect to petitioner's psychological evaluation, the letter is also an
9 immutable factor in that it will always be the same.

10 In observing that the facts of petitioner's commitment offense, petitioner's pre-
11 conviction criminal and social history, Dr. Frederickson's 2001 psychological evaluation, and
12 the 2002 letter from the District Attorney's Office opposing parole, are all immutable factors, the
13 court does not express any finding or opinion as to whether continued reliance solely on
14 immutable factors constitutes a due process violation based on clearly established law.

15 Finally, as to petitioner's conduct in prison, the record reflects that the Board
16 considered in 2004 a Life Prisoner Evaluation prepared by a correctional counselor.  This
17 evaluation was prepared <u>after</u> the 2002 parole hearing.  In the evaluation, the correctional
18 counselor opined that petitioner "would probably possess a moderate degree of threat to the
19 public at this time if released from prison."  The evaluation was based, in part, on interviews
20 with petitioner as well as his prison record of disciplinary action and constructive programming.
21 Clearly, the Life Prisoner Evaluation considered by the Board in 2004 is not an immutable factor
22 given that it reflects changes in petitioner's status.  Specifically, it is different than the Life
23 Prisoner Evaluation considered by the Board in 2002 and reflects petitioner's conduct since that
24 time.
25 / / /
26 / / /

Petitioner contends that the Board did not actually rely on the post-2002 Life Prisoner Evaluation.  According to petitioner, rather than relying on this evaluation, the Board actually "recognized discrepancies" and "acknowledged that the counselor who wrote the evaluation was not adequately reporting petitioner's participation and was also providing inappropriate personal views on petitioner's actions."  Petitioner is correct in his assertion that the Board noted a discrepancy between petitioner's actual performance in self-help programs and the counselor's negative opinion as to petitioner's motivations to participate in self-help programs.  Clearly the Board felt that petitioner's participation was positive but the counselor felt it was not motivated by a desire to improve himself.  However, noting this discrepancy does not negate the Board's reliance on the evaluation.  For example, even though the Board noted a discrepancy, it nonetheless concluded that parole should be denied because, among other reasons, petitioner needed "continued self-help programming" – just as the correctional counselor recommended in the Life Prisoner Evaluation at issue.   It is reasonable to conclude that the Board's finding that petitioner needed further self-help programming did not arise out of thin air, but that the source for the finding was, at least in part, the Life Prisoner Evaluation.

In addition, the "discrepancy" upon which petitioner places such great importance does not, in fact, appear to have been important.  First, the correctional counselor recommended further self-help programming, even though the counselor also felt that petitioner only wanted to spend less time in his cell and talk about himself.  If petitioner's motivations were truly problematic, it does not seem reasonable that the counselor would, at the same time, recommend additional self-help programming.  There would be no point recommending further self-help programming unless the counselor believed it would be a benefit.  Second, the Board did not reject the evaluation, suggesting that the "discrepancy" was not enough to discount the counselor's recommendations and conclusions.  Rather, the Board merely asked that a new counselor be assigned for petitioner's next evaluation.

/ / /

1    While the court finds that the Board continued to rely on several immutable

2 factors, the court also finds that, in relying on the post-2002 Life Prisoner Evaluation, the Board

3 necessarily relied on something new.  In making this finding, the court does not express an

4 opinion on the Board's continued reliance on immutable factors.  Because the Board necessarily

5 relied on something new – the post-2002 Life Prisoner Evaluation –  any claim that the 2004

6 denial of parole was based solely on immutable factors is simply not supported by the facts.

7 Again, this should not be construed as any kind of opinion as to the constitutionality of reliance

8 solely on immutable factors to deny parole.  Whether continued reliance solely on immutable

9 factors violates due process is simply not a question before the court on this record.

10    For petitioner to prevail he must demonstrate that the Life Prisoner Evaluation

11 does not constitute "some evidence" supporting the Board's decision.   Because this standard is

12 met by evidence which could support the decision to deny parole, see Hill, 472 U.S. at 455-56,

13 and because the post-2002 Life Prisoner Evaluation could support the 2004 parole denial, the

14 court concludes that the "some evidence" standard was met in this case.  Specifically, the Life

15 Prisoner Evaluation considered in 2004 reflects petitioner's entire prison record since 2002 and

16 concludes that petitioner would still pose a threat to society.  Clearly, this constitutes "some

17 evidence" to support the decision in 2004 to deny parole.  The state court's decision, therefore, is

18 neither contrary to nor an unreasonable application of clearly established federal law.

19    Petitioner contends that the Life Prisoner Evaluation cannot constitute "some

20 evidence" because the counselor was not permitted to make a risk assessment.  Petitioner cites In

21 re Cortez, an August 5, 2003, state trial court order in a habeas case in support of this contention.

22 In that decision, the state court concluded that, because the operations manual for the California

23 Department of Corrections and Rehabilitation ("CDCR") does not authorize a risk assessment

24 opinion, such opinions are not valid.  The court ordered that the Life Prisoner Evaluation be

25 redacted to delete any risk assessment opinion.  Petitioner also cites a September 2003 internal

26 CDCR memo regarding the "temporary elimination of the risk of threat assessment in the Model

1   Board Report Format."

2             At best, petitioner's argument suggests that the Life Prisoner Evaluation at issue

3   in this case was prepared in violation of state law.  Such a claim is not cognizable on federal

4   habeas review unless a due process violation is alleged.  Here, while petitioner asserts a due

5   process violation with respect to the parole denial, due process is satisfied in this context if

6   "some evidence" supports the decision.  Even though the evaluation may have contained an

7   assessment which is not proper under state law, that is not to say that the evaluation does not

8   constitute "some evidence."  If the court were to ignore the risk assessment, the fact remains that

9   the evaluation also concludes that petitioner would benefit from continued self-help

10  programming.

11            Petitioner also argues that the Life Prisoner Evaluation cannot constitute "some

12  evidence" because, in essence, it is not reliable.  Specifically, petitioner asserts that the

13  evaluation cannot serve as a basis upon which to deny parole because the correctional counselor

14  was not a mental health professional and because it was not based on any personal observations

15  or objective facts.  Petitioner does not cite any authority in support of his assertions.

16  Under the "some evidence" standard, all that is required is evidence which has some basis in

17  fact.  See Sass, 461 F.3d at 1129.   There is nothing inherent in this standard suggesting that such

18  evidence must meet any specific admissibility rules.  Moreover, as to petitioner's assertion that

19  the correctional counselor's evaluation was not based on any personal observations or objective

20  facts, the record demonstrates the contrary.  In particular, the Life Prisoner Evaluation states:

21  "This report is based on an interview with the prisoner . . ."

22            Because the court concludes that petitioner is not entitled to relief on the merits, it

23  is unnecessary to address respondents' exhaustion argument.  In addition, because the court

24  concludes that the 2004 parole decision at issue in this case was not based solely on immutable

25  factors, the court does not address if or when the continued reliance solely on such factors

26  constitutes a due process violation.  That question is not presented on the facts of this case.

**IV.  CONCLUSION**

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied and that the Clerk of the Court be directed to enter judgment and close this file.

These amended findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these amended findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Amended Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   February 6, 2007.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

15